## THE STATE OF INDIANA, EX REL. COLBERT, *v.* WHEELER.

[No. 21,483.  Filed July 2, 1909.]

1. CONSTITUTIONAL LAW.— *Statutes.— Repeal.— Amendment After Repeal.*—A valid act passed in 1895 covering the same subject-matter as statutes passed in 1889 and 1893 repealed such statutes; and an amendment of such statute of 1889, passed in 1897, is invalid.  p. 580.

2. CONSTITUTIONAL LAW.— *Statutes.— Enrolled Acts.— Presumptions.—Evidence.*—An enrolled act duly signed by the presiding officers of the two houses of the legislature is conclusive evidence of its passage in conformity to the requirements of the Constitution, and its validity cannot be attacked by showing the journals of the houses, or by other extrinsic evidence.  p. 580.

3. STATUTES.—*Publications.—Presumptions.*—The publication of an act in the "Acts" of the legislature constitutes *prima facie* evidence that such act is a law of the State.  p. 581.

4. WORDS AND PHRASES.— *"Missing."— Statutes.— Certificate of Secretary of State.*—The word "missing," as used in the certificate of the Secretary of State of the State of Indiana showing that Chapter CXLVI of the Acts of 1895 (p. 412) "was compared with

the engrossed bill, the enrolled bill being missing," imports that there had been an enrolled act, but that it was lost. p. 581.

5. EVIDENCE.— *Judicial Notice.— Statutes.— Enrolled Acts.*— The courts take judicial notice of the statutory law of Indiana, and that the enrolled act of 1895 (Acts 1895, pp. 359-362, Chapter CXLVI) is not on file in the office of the Secretary of State. p. 582.

6. EVIDENCE.— *Lost Statute.— How Determined.*— In determining the contents of a lost statute the courts will look to all available sources to ascertain the scope and meaning of such statute. p. 585.

7. CONSTITUTIONAL LAW.—*Statutes.—Veto Power.—How Exercised.* —To be effective, a veto by the Governor must be sent to the house wherein the bill originated in time for each house to reconsider the same and pass it over such veto, if desired. p. 587.

8. CONSTITUTIONAL LAW.—*Acts.—Filing by Governor with Secretary of State.—Failure of.*—The failure of the Governor to veto a bill or to file it with the Secretary of State does not prevent its becoming a law. p. 588.

9. CONSTITUTIONAL LAW.— *Veto.— How Shown.— Evidence.*— The veto of a house bill can be shown only by the journal of the house, oral testimony of a veto being inadmissible. p. 588.

10. CONSTITUTIONAL LAW.—*Veto.—Entering on House Journal.*— The Constitution (Art. 5, §14) imposes upon the proper house of the legislature, and not on its minute clerk, the duty of spreading of record the Governor's reasons for his veto. p. 589.

11. STATUTES.—*Repeal.—Statehouse Custodian.*—The act of 1895, providing that a board consisting of the Governor, Secretary of State and Auditor of State shall appoint the Custodian of Public Buildings and Property, is in force, and repealed the act of 1889 (Acts 1889, p. 114) and its amendment of 1893 (Acts 1893, p. 137), vesting such appointment in the Governor, the amendment of 1897 (Acts 1897, p. 118) being void. p. 590.

From Superior Court of Marion County (78,526); *Vinson Carter*, Judge.

Action by The State of Indiana, on the relation of Thomas F. Colbert, against Charles J. Wheeler. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*Bernard Korbly, Willard New* and *John W. Holtzman*, for appellant.

*Remy & Berryhill* and *Kane & Kane*, for appellee.

MONKS, J.—This action was brought by the relator for the possession of an office. The relator claims said office by

an appointment made by the Governor under the provisions of the act of 1889 (Acts 1889, p. 114), as amended by the act of 1893 (Acts 1893, p. 137), and the act of 1897 (Acts 1897, p. 118), while appellee claims said office and the possession thereof by virtue of an appointment made by the Board of Public Buildings and Property under the act of 1895 (Acts 1895, p. 359). The court below held that said act of 1895 was a valid law, and rendered judgment on demurrer in favor of appellee.

If said act of 1895 is a valid law, the same repealed said act of 1889, and also said act of 1893, so far as it authorized the Governor to appoint the Custodian of Public Buildings and Property, and said act of 1897 is invalid, because it attempted to amend said act of 1889, which had been repealed by said act of 1895. *Boring* v. *State, ex rel.* (1895), 141 Ind. 640, and cases cited; *Hilt* v. *Hilt* (1899), 152 Ind. 142, 144, and cases cited. It is evident, therefore, that the judgment of the court below must be affirmed if said act of 1895 is a valid law, but if it is not a valid law this case must be reversed.

1. It is settled law in this State that, when an enrolled act is authenticated by the signatures of the presiding officers of the two houses, it will be conclusively presumed that the same was enacted in conformity with all the requirements of the Constitution, and that the enrolled bill contains the act as it actually passed, and it is not allowable to look to the journals of the two houses, or to other extrinsic sources, for the purpose of attacking its validity or the manner of its enactment. *Evans* v. *Browne* (1869), 30 Ind. 514, 95 Am. Dec. 710; *Bender* v. *State* (1876), 53 Ind. 254; *Board, etc.,* v. *Burford* (1884), 93 Ind. 383, and cases cited; *Stout* v. *Board, etc.* (1886), 107 Ind. 343, 347; *Edgar* v. *Board, etc.* (1880), 70 Ind. 331, 338; *State, ex rel.,* v. *Boice* (1895), 140 Ind. 506, 513-515, and cases cited; *Western Union Tel. Co.* v. *Taggart* (1895), 141 Ind. 281, 60 L. R. A. 671, and cases cited; *Lewis* v. *State* (1897), 148 Ind.

346, 350; 26 Am. and Eng. Ency. Law (2d ed.), 556. See, also, *Sherman* v. *Story* (1866), 30 Cal. 253, 89 Am. Dec. 93; *People* v. *Harlan* (1901), 133 Cal. 16, 65 Pac. 9; *Yolo County* v. *Colgan* (1901), 132 Cal. 265, 64 Pac. 403, 84 Am. St. 41; *State, ex rel.,* v. *Young* (1866), 32 N. J. L. 29; *Field* v. *Clark* (1892), 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294.

Said act of 1895 appears in the "Acts of 1895," a book published by authority of the State, as Chapter CXLVI thereof, and this is at least *prima facie* evidence that

3. the same was a law of this State. §472 Burns 1908, §456 R. S. 1881; *Coleman* v. *Dobbins* (1856), 8 Ind. 156, 162; *People* v. *Supervisors, etc.* (1853), 8 N. Y. 317, 324.

Section 7616 Burns 1894, §5593 R. S. 1881, in force when said act of 1895 was published, provided that the Secretary of State "shall deliver to the state printer, at the earliest day practicable, copies of all acts,  *  *  *  as they are passed by the General Assembly  *  *  *  and he shall superintend the printing and binding of said laws."

Section 7618 Burns 1894, §5595 R. S. 1881, in force when said act of 1895 was published, made it the "duty of the Secretary of State, as soon as the printing of the acts shall be done, to certify the fact that he has compared the printed with the enrolled acts and joint resolutions, and found them correctly printed, which certificate shall be signed and dated by said secretary, and annexed, in print, to the volume of acts and joint resolutions." Said section also provided that "said secretary is hereby authorized to use the engrossed bills, which he is to return to the state library when the printing is complete."

The certificate of the Secretary of State to the acts of 1895, shows that Chapter CXLVI, being pages 359-362 of the acts of 1895, "was compared with the engrossed

4. bill, the enrolled bill being missing." The Century Dictionary defines "missing" as "not present or not

found; absent, gone." The Standard Dictionary defines it as "absent from the proper or accustomed place; lost, gone; as, a missing soldier." The use of the word "missing" means that there was, to the knowledge of the Secretary of State, such enrolled act, but at the time he compared said printed act with the engrossed bill the enrolled act was lost or gone. The certificate of the Secretary of State is at least *prima facie* evidence that there was such an enrolled act, and that the same was an existing law of this State.

We know judicially that said enrolled act is not now on file in the office of the Secretary of State. In case the enrolled act is missing, how may the courts decide as 5. to such a statute? It is settled that the courts of this State must take judicial knowledge of what is and what is not the public statutory law of this State. *Evans* v. *Browne, supra,* and cases cited; *Gardner* v. *Barney* (1867), 6 Wall. 499, 18 L. Ed. 890; *Prince's Case* (1606), 8 Coke *27. It was said in *Evans* v. *Browne, supra,* pages 519-521: "Can it be tolerated that a court must be informed what the law is by the verdict of a jury, as would be in criminal cases? That in one case it shall be compelled, by the finding of an issue, to determine that the legislature has enacted thus and so, and in the very next case to be tried, where the same issue is not made by the pleadings, or the same evidence has not been produced, or another jury has found differently, the very same court must determine that there is no such statute? It is a maxim old as the common law, and a rule of necessity, that the court takes judicial notice of public law; it is presumed to know what it is, and it is its duty to know it. Even the private citizen must know it at his peril; and his responsibilities and duties are based upon the conclusive presumption that he has this knowledge. Must the court employ the machinery of a trial to give information to the judge, which, as a citizen, he must, at the risk, possibly, of his liberty or life, have possessed before he was called

to the bench? It is a most mischievous departure from plain and wise maxims derived from that system of laws which forms the basis, and constitutes largely the body, of ours; and, while it would have disturbed the harmony and order of judicial administration in England, it would in this State, in view of the provisions of our Constitution, which contain specific directions for the mode of authenticating statutes by high legislative officers, acting under solemn oath, and require a journal of legislative proceedings to be kept and published, be entirely destitute of any conceivable utility. * * * It may be true that, ordinarily, the courts would not, unless the matter was questioned, make any investigations beyond the statute book itself; but this argument is not forcible; for the industry and research of counsel can as well put the court upon inquiry by an argument and a reference to the sources of information, as by pleading upon the record. To us it seems an astonishing fact in the history of jurisprudence, that there should, in this country especially, have ever existed a conflict of decisions upon this subject, or that it should have been seriously presented as a question for judicial determination.''

It is held in *Sherman* v. *Story, supra,* that the correctness of the publication or existence of a statute cannot be tried as a question of fact, but must be determined as one of law by the court. The court said concerning this question: ''We have not been referred to any provision of the constitution, or of the statute—and we know of none—which in any degree impairs the dignity of this solemn record, or modifies the principles of the common law applicable to it. But it may be well to notice the observations of judges in the decisions of other states, to show that in no instance in the older states has the common law been departed from to the extent required to annul the statute under consideration. At common law not even the plea of *nul tiel record* was admissible. There was no plea by which the existence of

a general act of parliament, as a question of fact, could be put in issue and tried. It was regarded as a question of law alone, of which the judges were bound to take notice. If the enrollment was in existence they would consult, but, of course, would not go beyond that record. But if that had been lost or destroyed, and there was no printed statute, it was necessary for the judges to look for it in other documents where it had been recited or recognized and acted upon, or to inform themselves in the best mode they could. It was still a question of law, and not of fact, and they were supposed to know the law. Thus in *Prince's Case* [1606], 8 Coke *27, 'it was resolved that against a general act of parliament, or such act whereof the judges *ex officio* ought to take notice, the other party cannot plead *nul tiel record;* for of such acts the judges ought to take notice; but if it be misrecited the party ought to demur in law upon it. And, in that case, the law is grounded upon great reason; for, God forbid, if the records of such acts should be lost or consumed by fire, or other means, that it should tend to the general prejudice of the commonwealth; but rather, although it be lost or consumed, the judges, either by the printed copy, or by the record in which it was pleaded or, by other means, may inform themselves of it.' See, also, Dwarris, Statutes, p. 613. * * * Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than, that every act, state and national, should at any and all times be liable to be put in issue, and impeached by the journals, loose papers of the legislature, and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable. * * * The result of the authorities in England and in other states clearly is, that, at common law, whenever a general statute is misrecited, or its existence denied, the question is to be tried and determined by the court as a question of law—that is to say, the court is bound to take notice of it, and inform itself the best way it can; that there

is no plea by which its existence can be put in issue and tried as a question of fact; that, if the enrolment of the statute is in existence, the enrolment itself is the record, which is conclusive as to what the statute is, and cannot be impeached, destroyed, or weakened by the journals of parliament or any other less authentic or less satisfactory memorials; and that there has been no departure from the principles of common law in this respect in the United States, except in instances where a departure has been grounded on or taken in pursuance of some express constitutional or statutory provision requiring some relaxation of the rule, in order that full effect might be given to such provisions; and in such instances the rule has been relaxed by the judges with great caution and hesitation, and the departure has never been extended beyond an inspection of the journals of both branches of the legislature.''

It is said in 1 Kent's Comm. (14th ed.), *460: ''Public acts cannot be put in issue by plea. *Nul tiel record* cannot be pleaded to a public statute; the judges are to determine the existence of them from their own knowledge.''

The Supreme Court of the United States said in *Gardner* v. *Barney, supra,* page 511: ''We are of opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it, have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule.''

The following facts are shown by the house and the senate journals of 1895: House bill No. 132 was passed by the house of representatives on February 28, 1895 (said bill is set out at full length in said house journal, and contains a section declaring an emergency and a sec-

tion repealing all other laws in conflict therewith). Said bill was transmitted to the Senate on March 2, 1895, and, after being amended, was passed by that body on March 7, 1895. Said bill, on the same day, was transmitted to the house with the senate amendment, which amendment, as transmitted to the House, reads as follows: ''Nothing contained in this act shall apply to or in anywise affect the office of statehouse engineer as now established by law, but said office and the manner of electing the incumbent, his duties and compensation, remain and continue as now fixed by law.'' Said amendment was agreed to by the house on March 7, 1895, and the same day, the speaker of the house announced that he had signed enrolled house bill No. 132. On March 8, 1895, the president of the senate announced to the senate that he had signed enrolled house bill No. 132. Said enrolled house bill No. 132 is the act in controversy in this case. On March 8, 1895, the same was presented to the Governor for his approval or disapproval, as required by article 5, §14, of the Constitution of this State.

It is clear from the house and the senate journals, the files in the Governor's office and the files in the custody of the State Librarian under §9294 Burns 1908, Acts 1903, p. 152, §6, that said act, as published on pages 359-362 of the acts of 1895, is a correct copy of enrolled house bill No. 132, presented to the Governor on March 8, 1895.

Said article 5, §14, of the Constitution reads as follows: ''Every bill which shall have passed the General Assembly shall be presented to the Governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated, which house shall enter the objections, at large upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other house, by which it shall likewise be reconsidered; and if approved by a majority of all the

members elected to that house, it shall be a law. If any bill shall not be returned by the Governor within three days, Sunday excepted, after it shall have been presented to him, it shall be a law without his signature, unless the general adjournment shall prevent its return, in which case it shall be a law, unless the Governor, within five days next after such adjournment, shall file such bill, with his objections thereto, in the office of Secretary of State, who shall lay the same before the General Assembly, at its next session, in like manner as if it had been returned by the Governor. But no bill shall be presented to the Governor within two days next previous to the final adjournment of the General Assembly.''

It will be observed that article 5, §14, of the Constitution does not give to the Governor an absolute veto, but the two houses have the constitutional right to pass the same over his veto in the manner provided in said section.

It follows, therefore, that if the Governor returns a bill to the house in which it originated on the last day of a session as fixed by the Constitution, the same must be returned at such an hour on said day as will afford each house an opportunity to exercise its constitutional right to pass the same over such veto. If said objections are returned with the bill to the house in which it originated on said last day of such session at such an hour that the house can neither reconsider the bill nor examine the objections to its passage before the time fixed by the Constitution for its adjournment *sine die,* this does not constitute the return required by the constitution. *Harpending* v. *Haight* (1870), 39 Cal. 189, 199-201, 2 Am. Rep. 432.

Where an act is not approved by the Governor, and it takes effect by the lapse of time by reason of his failure to return the same, with his objections thereto, to the house in which it originated, such act when it contains an emergency clause, as said act of 1895 did, will go into effect immediately on the expiration of the time given by article 5, §14, of the Constitution for the Governor to consider and return bills,

State, ex rel., *v.* Wheeler—172 Ind. 578.

whether or not the same is filed in the office of the Secretary of State. *Stalcup* v. *Dixon* (1893), 136 Ind. 9.

It is evident that said enrolled house act No. 132 became a law, unless the Governor vetoed the same, as provided by said article 5, §14, of the Constitution, whether or not it was filed in the office of the Secretary of State.

Counsel for the relator correctly say that the only question in this case is whether the Governor vetoed said act, as it is alleged he did on March 11, 1895, the same being the last day of said session as fixed by the Constitution. This section of the Constitution requires that the house to which such objections of the Governor are returned with the bill shall enter the objections at large upon its journal. No objections of the Governor to said house bill No. 132 were entered upon the journal of the house for 1895, nor does the house journal for that year show that the Governor vetoed said bill. Counsel for relator, however, insists that oral testimony is admissible to establish the allegation that said bill was vetoed. It is clear from what has been said in this opinion, and from the authorities cited, that oral testimony is not admissible for such purpose. In other words, the silence of the house journal, upon a matter which, if it occurred, the Constitution requires the house to enter it upon its journal, is conclusive that it did not occur as against oral testimony to the contrary. To hold otherwise is to overlook the fact that legislators are sworn to support the Constitution, or else assume they have wilfully violated that oath. The case of *United States* v. *Allen* (1888), 36 Fed. 174, is therefore not in point in this case.

It is argued by counsel for the relator that to hold that it cannot be shown by oral testimony that the Governor vetoed a bill when the record of the house to which the veto was returned is silent on that subject, would be to defeat the power of the Governor to veto a bill passed by the General Assembly, and confer upon the minute clerk of the house

more power than was given to the Governor by the Constitution.

The Constitution imposes upon the house, and not upon the minute clerk, the duty of entering the veto message upon its journal. That the house might fail to perform this duty may be possible; but as said by this court in *Evans* v. *Browne, supra,* on a like question: "Public authority and political power must, of necessity, be confined to officers, who, being human, may violate the trusts reposed in them. This perhaps cannot be avoided absolutely. But it applies also to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise coördinate departments and correct or prevent abuses of their authority. It cannot authenticate a statute; that power does not belong to it; nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. It cannot, we think, look beyond that authentication, because of the Constitution itself. If it may, then for the same reason it may go beyond the journal, when that is impeached; and so the validity of legislation may be made to depend upon the memory of witnesses, and no man can, in fact, know the law, which he is bound to obey. Such consequences would be a large price to pay for immunity from the possible abuse of authority by the high officers who are, as we think, charged with the duty of certifying to the public the fact that a statute has been enacted by competent houses. Human governments must repose confidence in officers. It may be abused, and there may be no remedy. Nor is there any great force in the argument which seems to be regarded as of weight by some American courts, that some important provisions of the Constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argu-

ment overlooks the fact that legislators are sworn to support the Constitution, or else it assumes that they will wilfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligations."

It follows that said enrolled house act No. 132 (Acts 1895, pp. 359-362), is a valid law, and that the same repealed the act of 1889 (Acts 1889, pp. 114-118), and also the act of 1893 (Acts 1893, p. 137), so far as it authorized the Governor to appoint the Custodian of Public Buildings and Property, and that said act of 1897 (Acts 1897, pp. 118-120) is invalid, because it attempted to amend said act of 1889, which had been repealed by said act of 1895.

The judgment of the court below is affirmed.